**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**YANCY MATOS,**

                                        **Plaintiff,**                        **14-CV-120Sr**

**v.**


**PEERLESS INSURANCE COMPANY,**

                                **Defendant.**

_____


## DECISION AND ORDER

        Pursuant to 28 U.S.C. § 636(c), the parties have consented to the

assignment of this matter to the undersigned to conduct all proceedings in this case,

including the entry of final judgment.  Dkt. #13.


        Yancy Matos, d/b/a Certified Enterprises, LLC, seeks reimbursement

pursuant to an insurance policy for damages to his business premises and contents

following an alleged burglary and fire at 1054 Broadway, Buffalo, New York, on

September 23, 2011.  Dkt. #1-1, p.2.


        Currently before the Court is: (1) defendant Peerless Insurance

Company's ("Peerless'"), motion to compel (Dkt. #18); (2) plaintiff's motion for partial

summary judgment seeking liability on his breach of contract claim and to compel

compliance with discovery demands (Dkt. #19); and (3) defendant's motion for partial

summary judgment. Dkt. #26.  For the following reasons, defendant's motion to compel

Mr. Powers' deposition (Dkt. #18), is granted; plaintiff's motion for partial summary judgment (Dkt. #19), is denied; plaintiff's motion to compel (Dkt. #19), is granted in part and defendant's motion for summary judgment (Dkt. #26), is granted in part.


## FACTS

Plaintiff purchased the building at 1054 Broadway Street, Buffalo, New York, on March 4, 2009 for $60,000.  Dkt. #22-2, p.7 & Dkt. #31-10, ¶ 9.  Plaintiff purchased the lot in 2010 for $825.  Dkt. #31-10, ¶ 9.  Plaintiff and his girlfriend, Anita Rodriguez, operated a custom printing business, Certified Enterprises, Inc., at the premises.  Dkt. #19-8, ¶ 3.  Plaintiff improved the premises by renovating the first floor for the printing business, replacing two furnaces and two hot water heaters, installing ductwork to heat the third floor, running water to the third floor, and installing a shower on the second floor.  Dkt. #31-10, ¶ 9.  The first floor of the building, which was the largest, was utilized for the printing business; the second floor is used for personal storage; and the third floor was utilized by kids from the neighborhood to hang out so that they were off the streets.  Dkt. #19-17, pp.5-7.


Peerless issued a business owners policy to plaintiff insuring the property under policy number 8599022, from January 27, 2011 to January 27, 2012.  Dkt. #19-7, ¶ 4.  The limit of insurance for the building (replacement cost) is $703,040.00  Dkt. #23-4.  Plaintiff avers that the insurance agent chose the coverage amount.  Dkt. #30-5, ¶ 2.


Plaintiff avers that, at approximately 1:30 am on September 23, 2011, as he was locking the back door of the premises, two individuals came up from behind him

and put a gun to his head.  Dkt. #19-8, ¶ 5.  The individuals forced plaintiff back inside

the building and one individual demanded that plaintiff lie face down on a couch while

the other individual took possession of two laptop computers and a Play Station 3.  Dkt.

#19-8, ¶ 6.  The individuals smashed the surveillance equipment, poured gasoline on

the floor, started a fire and ran away.  Dkt. #19-8, ¶ 7.  Plaintiff called 911 and

emergency personnel arrived to extinguish the fire and investigate the incident.  Dkt.

#19-8, ¶ 8. Plaintiff arrived home at approximately 5:00 am.  Dkt. #19-8, ¶ 9.


At approximately 8:00 am on September 23, 2011, plaintiff received a

telephone call at his home from NFA manager Angelo Puccio advising that another fire

had been started with gasoline at the back entrance to the building.  Dkt. #19-8, ¶ 10.

Mr. Puccio advised that the firefighters extinguished the flames, but failed to sufficiently

secure the entrance after knocking down the door to check inside the building for

flames, allowing thieves to take a television and penny jar and to break open an empty

cash register.  Dkt. #19-8, ¶¶ 10-11.


By email dated October 21, 2011, Christian Waddington, Senior

Investigator in the Special Investigations Unit of Liberty Mutual, Peerless' parent

company, advised Donald Tolhurst, Senior Claims Specialist in the Commercial

Insurance Claims Department for Liberty Mutual Insurance, that

> My investigation at this point is complete.  I am waiting on
> Buffalo fire to get the surveillance from inside.  They are in
> process of accessing that and will call me.  That is the only
> hold up. I agree that the circumstances are very odd, but at
> the moment, we cannot refute his statement unless he says
> something contrary to Buffalo fire, but they are not going to

> interview him until they see the surveillance.
> Bottom line, at this point we are waiting on Buffalo fire.  Just
> want you to know that so you can decide if that is cause
> enough to hold up his claim.

Dkt. #30-2, p.10.

 

 

On February 15, 2012, plaintiff submitted a claim for damages in the amount of, *inter alia*, $76,863.30 for the building and $52,459.99 for business personal property.  Dkt. #18-2, p.41 & Dkt. #19-8, p.8.  An adjuster assigned by National Fire Adjustment Co., Inc. ("NFA"), Angelo Puccio, avers that in cases of partial building losses, such as the instant case, the insurance company

> owes the lesser of the amount of insurance; the actual cash
> value of the building; or the cost of repair with material of like
> kind and quality within a reasonable time after such loss.  In
> this particular case, since it was a partial building loss and
> not a total, and the actual cash value of the building and the
> amount of insurance exceeds the cost to repair, the limiting
> factor is the cost to repair which is $76,863.30, not the cost
> to repair less depreciation of the repairs.

Dkt. #31-11, ¶ 9.

 

 

Defendant calculated the replacement cash value of the building at $49,688.16, the actual cash value of damage to the building at $43,876.14 and the actual cash value of damage to the building's contents at $33,701.11. Dkt. #30-2, p.13 & Dkt. #31-5, pp.24 & 26.

 

 

The insurance policy provides that Peerless will, at its option, either: (1) pay the value of lost or damaged property; (2) pay the cost of repairing or replacing the lost or damaged property; (3) take all or any part of the property at an agreed or

appraised value; or (4) repair, rebuild or replace the property with other property of like

kind an quality.  Dkt. #23-4, p.68.  The policy provides that Peerless will determine the

value of Covered Property as follows:

> d. (1)  At replacement cost without deduction for
>         depreciation, subject to the following:
>
>                          * * *
>
>         (a) You may make a claim for loss or
>             damage covered by this insurance on
>             an actual cash value basis instead of on
>             a replacement cost basis.  In the event
>             you elect to have loss or damage settled
>             on an actual cash value basis, you may
>             still make a claim on a replacement cost
>             basis if you notify us of your intent to do
>             so within 180 days after the loss or
>             damage.
>
>         (b) We will not pay on a replacement cost
>             basis for any loss or damage:
>
>             (I) Until the lost or damaged
>                 property is actually repaired or
>                 replaced; and
>
>             (ii) Unless the repairs or
>                  replacement are made as soon
>                  as reasonably possible after the
>                  loss or damage.
>
>         (c) We will not pay more for loss or damage
>             on a replacement cost basis than the
>             least of:
>
>             (I) The cost to replace, on the same
>                 premises, the lost or damaged
>                 property with other property:
>
>                 I.  Of comparable material
>                     and quality; and
>
>                 ii. Used for the same purpose; or

>    (ii) The amount you actually spend
>         that is necessary to repair or
>         replace the lost or damaged
>         property.

Dkt. #23-4, pp.68-69.

By email dated April 27, 2012, Mr. Waddington advised Mr. Tolhurst of the

completion of plaintiff's Examination Under Oath and opined that there are

>    no findings or evidence that the insured set the fire.  At least
>    not based on his testimony.  We still do not have the
>    surveillance from ATF.  It appears that he was the victim of a
>    hit.  We highly suspect that he was into drugs and might
>    have been a target of a rival, but cannot prove that he is
>    withholding that.  That being said, we have the following
>    concerns:
>
>    1) there is no evidence to support any form of a loss of
>    business claim
>
>    2) we may have a 15% reduction . . . for partial vacancy.
>    Only 1 out of 4 floors were being used by the insured
>
>    3) we are looking at negating the entire contents claim since
>    the policy is for Yancy and Yancy owns the building.  The
>    business is owned by Anita and she is not an insured.

Dkt. #30-2, p.11.

By letter dated January 21, 2013, Peerless disclaimed liability and denied

coverage for plaintiff's claim due to dishonesty and fraud, "including but not limited to

statements as to the cause of the damage to the subject property."  Dkt. #19-10, p.8.

Peerless also disclaimed due to plaintiff's failure to cooperate with the investigation of

the claim, including his failure to answer questions truthfully during the examination

under oath.  Dkt. #19-10, p.8.  Peerless also claimed breach of a policy provision precluding payment for loss or damage under certain circumstances where the building was vacant.  Dkt. #19-10, p.8.

Plaintiff sold the premises for $46,000 on May 21, 2013.  Dkt. #31-10, ¶ 10.  Plaintiff avers that he sold the property because of the traumatic memories of the incident on September 23, 2011 and because he was unable to repair the property due to defendant's refusal to provide him with insurance proceeds.  Dkt. #31-10, ¶¶ 3 & 5-7.

Plaintiff commenced this action in New York State Supreme Court, County of Erie on July 1, 2013.  Dkt. #1-1.  It was removed to this Court based upon diversity of citizenship on February 21, 2014.  Dkt. #1.  Plaintiff alleges a single cause of action for breach of the insurance policy.  Dkt. #1-8.

Plaintiff noticed a 30(b)(6) deposition of an employee of Peerless who could testify regarding, *inter alia*, the following subjects: (1) the decision to deny plaintiff's insurance claim; (2) the investigation into plaintiff's claims including evidence obtained to lead Peerless to believe that the fire was started by or on behalf of plaintiff; (3) Peerless policies for claims where arson is suspected.  Dkt. #19-11. Peerless produced Mr. Tolhurst, who testified that plaintiff's claim was denied because of Peerless' opinion that plaintiff set the fire.  Dkt. #30-1, p.4.  When asked whether he had any evidence that plaintiff set the fire, however, Mr. Tolhurst respond, "I don't know" and "I don't remember."  Dkt. #19-12, p.6.  Mr. Tolhurst subsequently stated that he did

not have evidence that plaintiff set the fire.  Dkt. #19-12, p.8.  Mr. Tolhurst was also

unaware of  any dishonest act committed by plaintiff.  Dkt. #19-12, pp.10-11.  When

asked about the vacancy provision of the insurance policy, Mr. Tolhurst explained that

the insurance policy requires 70 percent usage but that only one of the four floors was

being used by the business.  Dkt. #19-12, p.14.


        In a declaration dated December 2, 2015, Mr. Tolhurst explains that this

was his first deposition and he was surprised at how nervous he was.  Dkt. #23-4, ¶ 17.

Mr. Tolhurst declares that because of his nervousness and plaintiff's counsel's

demeanor, he "had some unexpected difficulty recalling all of the specific facts of the

claim."  Dkt. #23-4, ¶ 18.  Mr. Tolhurst specifically declares that although he "personally

did not have any evidence that plaintiff had personally set the first fire of September 23,

2011," he "should have had the presence of mind to clarify that there is however

significant evidence that Mr. Waddington in particular had gathered during his

investigation of the claim showing Mr. Matos' story about what happened on September

23, 2011 was not believable and that Mr. Matos had motive, means and opportunity to

set the fires of September 23, 2011 and/or arrange for them to be set and to create the

story about the reported thefts and/or go along with others pretending to rob him."  Dkt.

#23-4, ¶ 19.


        Christian Waddington declares that he "did not find plaintiff's story about

what he says happened at the subject premises before, during, and after the reported

fire/theft/losses of September 23, 2011 credible for many reasons."  Dkt. #23-3, ¶ 8.

Specifically, Mr. Waddington declares that "plaintiff was having cash flow problems and was in financial distress at the time of the reported fire/theft losses" and "had been trying to sell the subject premises commercial property during the year prior to the reported fire/theft losses."  Dkt. #23-3, ¶¶ 10 & 14.  Mr. Waddington believed that plaintiff's "incredible story is not believable" and lacked corroboration.  Dkt. #23-3, ¶¶ 17 & 19.  For example, Mr. Waddington declares that

> although the perpetrators had plaintiff down on the couch at gunpoint and stole two laptops (according to plaintiff) as well as his Play Station 3, they did not steal the silver bracelet he was wearing, nor did they steal the money plaintiff had on him, nor his cell phone, nor his watch that he valued at (during his EUO) $250 . . . . Third, the alleged perpetrators mysteriously knew that the subject insured premises had an alarm system and would need to be disabled, and somehow knew or determined very quickly that plaintiff had a surveillance system at the subject insured premises that included three or four cameras constantly shooting video inside the subject premises on the first floor where the alleged attack and the reported theft and fire occurred. Fourth, subsequent investigation of the claim included obtaining plaintiff's cell phone records and plaintiff was unable to identify who he called on his cell phone one minute after dialing 9-1-1 to report the 1:30 am fire/attack/theft, although plaintiff could identify all other numbers he called that night.  Fifth, the perpetrators did not take plaintiff's cell phone from him before leaving, which one would think they would do to ensure plaintiff didn't call the police on them as they were making their escape. Sixth, plaintiff had collected on a prior fire loss claim of approximately $30,000 (according to his EUO testimony) on the fire insurance for his 804 Niagara Street, Buffalo residence approximately seventeen months before reporting the September 23, 2011 fire at the subject premises. Seventh, we know from further investigation including further review of plaintiff's cell phone records that everything plaintiff claims occurred beginning at approximately 1:30 a.m. on September 23, 2011 had to have occurred within a seven-minute window, between the time of the last call plaintiff made while inside the subject premises before the alleged

perpetrators arrived, and the time of plaintiff's call to 9-1-1 from outside the premises after the alleged perpetrators left. It is simply implausible that all plaintiff has said occurred respecting the alleged perpetrators and their actions could have occurred in less than seven minutes, considering plaintiff says one of the two alleged perpetrators stayed on the couch with him almost the entire time, leaving it to the other alleged perpetrator alone to do all the destroying of the surveillance system equipment including the destroying of the surveillance computer's hard drive, the pouring of gasoline in various places around the first floor of the building, the lighting of the fires, and the stealing of the laptops. Plaintiff's recorded statement also indicates approximately 62 seconds passed from the time he re-entered the subject premises at gunpoint under orders from the perpetrators until the time he punched in the code at gunpoint to turn off the alarm system with eight second [sic] left before the alarm went off. Those first 62 seconds occurred before any destruction of the surveillance system started, and, some unknown amount of the seven minutes of time between his cell phone calls had passed before he was ever attacked by the alleged perpetrators outside the back door of the insured premises. Eighth, plaintiff had motive, means and opportunity to torch the subject premises and to collect on the insurance.

Dkt. #23-3, ¶ 19. Mr. Waddington also notes that although plaintiff admitted that he had gasoline on his clothing, no gasoline was discovered on the floor of the front room where plaintiff claims to have slipped on the gasoline. Dkt. #23-3, ¶ ¶ 45 & 47. In addition, Mr. Waddington notes that plaintiff informed him that the printing business was not profitable and that plaintiff's testimony of receiving monthly annuity payments of $2,800 from an automobile accident were not reflected in his bank statements, which showed near zero balances. Dkt. #23-3, ¶¶ 11 & 38. In fact, it was subsequently determined that plaintiff sold his structured settlement payments on May 22, 2008. Dkt. #23, ¶ 25.

-10-

Plaintiff denies that he was in financial distress, averring that at the time of the fire, he was current on all obligations and had cash on hand that he kept in a safe rather than a bank because his identity had been stolen and his bank account had been frozen.  Dkt. #30-5, ¶¶ 5 & 6.

## DISCUSSION AND ANALYSIS

**Motion to Compel Deposition of Donald Powers**

Plaintiff disclosed Donald R. Powers, Chief Estimator and Inventory Specialist of Losses for NFA, as an expert witness.  Dkt. #18-2, p.3.

By letter dated October 16, 2015, defense counsel noted that Mr. Powers failed to appear for his deposition and requested dates from plaintiff's counsel to reschedule Mr. Powers' deposition.  Dkt. #18-2, p.60.  On October 30, 2015, defense counsel again requested that plaintiff's counsel reschedule Mr. Powers' deposition. Dkt. #18-2, p.63.

Plaintiff's counsel responded that he did not know when Mr. Powers would be back in Buffalo and inquired whether defense counsel would pay his airfare to attend the deposition.  Dkt. #18-2, p.64.  Mr. Powers currently resides in Tennessee.  Dkt. #22, ¶ 15. Defense counsel advised that they would pass the inquiry along to their client and requested dates that Mr. Powers would be available.  Dkt. #18-2, p.65.

Defendant moves to compel Mr. Powers' deposition.  Dkt. #18.

Plaintiff responds that defendant has yet to confirm that it would pay Mr. Powers' expenses.  Dkt. #22, ¶ 11.

Defendant replies that it previously advised that it would pay a reasonable hourly rate for the expert's time spent at the deposition and for not more than two hours of preparation.  Dkt. #24, ¶ 10 & Dkt. #24-1, p.6.

Fed. R. Civ. P. 26(b)(4)(A) provides that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial."  Fed. R. Civ. P. 26(b)(4)(E) provides that

> Unless manifest injustice would result, the court must require that the party seeking discovery: (I) pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) . . .

The underlying purpose of Rule 26(b)(4)(E) "is to compensate experts for their time spent participating in litigation and to prevent one party from unfairly obtaining the benefit of the opposing party's expert's work  free from cost."  *New York v. Solvent Chemical Co., Inc.,* 210 F.R.D. 462, 468 (W.D.N.Y. 2002), *quoting Goldwater v. Postmaster General*, 136 F.R.D. 337, 339 (D.Conn.1991).  "In implementing this rule, courts aim to calibrate the fee so that [parties] will not be hampered in efforts to hire quality experts, while [their adversaries] will not be burdened by unfairly high fees preventing feasible discovery and resulting in windfalls to the expert."  *Mannarino v. United States*, 218 F.R.D. 372, 374 (E.D.N.Y. 2003) (internal quotation omitted). Thus, "the expert certainly should be reimbursed for any time during which he was unavailable to do other work."  *McHale v. Westcott*, 893 F. Supp. 143, 151 (N.D.N.Y. 1995).  This includes time spent preparing for

a deposition, "time spent traveling to and from the deposition, and the expenses incurred during travel, so long as they are reasonable." *Solvent Chem. Co.*, 210 F.R.D. at 471-72.

The party seeking to be reimbursed bears the burden of demonstrating that the fee sought is reasonable. *Id.* at 468. In addition, "[t]he rule and the case law makes it clear that the parties seeking court intervention to determine a reasonable fee for an expert deposition should do so retrospectively – that is, after the deposition has taken place." *Conte v. Newsday, Inc.*, No. CV 06-4859, 2011 WL 3511071, at *3 (E.D.N.Y. Aug. 10, 2011).

Subject to these parameters, defendant's motion to compel the deposition of Donald Powers is granted.

**Motion to Compel Production of Documents**

Plaintiff's Request for Production of Documents and Things seeks, as relevant to the instant motion, "Defendant's entire claim file on Plaintiff's submitted claim in this instant action." Dkt. #30-2, p.5. Subject to objections for "documents protected from disclosure by the attorney-client privilege, the work-product privilege, and/or the trial preparation privilege in that plaintiff seeks documents that post-date defendant's decision to deny plaintiff's claim," defendant produced "non-privileged claim file documents and records pre-dating the point in time when Peerless made a firm decision to deny coverage on the claim." Dkt. #30-2, p.5. Defendant also provided a privilege log and "certain redacted documents." Dkt. #30-2, p.5.

By letter dated October 25, 2015, plaintiff's counsel advised defense

counsel that:

> In response to Defendant's responses to Plaintiff's request
> for production of documents and things, I previously voiced
> my objection over the documents withheld or redacted -
> especially those prior to the denial of coverage and reports.
> As you are aware, the reports are made in the ordinary
> course of business and communications regarding the
> investigation before the denial of the claim are made in the
> ordinary course of business (Nicastro v. New York Cent.
> Mut. Fire Ins. Co., 117 A.D.3d 1545 (4th Dept. 2014). Your
> privilege log contains numerous communications that
> occurred prior to the denial letter.  Additionally, there are
> redactions on the reports of Professional Claims
> Management regarding the adjustment of Plaintiff's claim.
> As such, I am requesting that you fully comply with Plaintiff's
> discovery demands as to the withheld communications and
> redactions on the report.

Dkt. #19-19.


Defense counsel declares that he has no recollection of any conversation

regarding Peerless' discovery responses prior to receipt of this letter.  Dkt. #23, ¶ 16.

Moreover, notwithstanding that the letter is dated October 25, 2015, defense counsel

declares that it was received in the mail by counsel on November 10, 2015.  Dkt. #23,

¶ 19.  The postmark on the envelope is dated November 9, 2015.  Dkt. #23, ¶ 21 &

p.64.


Plaintiff filed this motion on November 10, 2015.  Dkt. #19.  Plaintiff seeks

production of all documents created prior to the denial of plaintiff's claim, unless the

documents primarily contain legal advice.  Dkt. #19-2, p.16.

Defendant argues that the motion is premature, as plaintiff failed to make a good faith effort to resolve the dispute prior to filing this motion.  Dkt. #23-2, pp.19-20. In any event, defendant argues that plaintiff failed to identify or specify what documents he is seeking or to challenge defendant's privilege log.  Dkt. #23-2, pp.22-24.

Plaintiff reiterates that defendant "has withheld and/or redacted documents and reports that were discoverable and not privileged."  Dkt. #30-6, p.10. More specifically, plaintiff argues that he "is primarily concerned with documents ascertaining the actual cash value of Plaintiff's loss and those nonlegal documents discussing evidence of arson," noting that, he "still has not received any such documents from Defendant."  Dkt. #30-6, p.11.

Setting aside defendant's legitimate concern about plaintiff's lack of a good faith effort to resolve this dispute before filing a motion to compel, a review of the privilege log provided by defendant reveals only two documents which precede the denial letter dated January 21, 2013 and are not described in terms of drafting said denial letter.  Dkt. #23, pp.52-59.  The first such document, dated December 17, 2013, is described as an email between a Specialty Claims Consultant and defendant's attorney "regarding hard drive recovered from surveillance equipment at subject premises."  Dkt. #23, p.52.  The second document, dated December 23, 2014, is described as an email between the same parties regarding the litigation budget.  Dkt. #23, p.53.

In federal diversity actions, issues of attorney-client privilege are governed by New York law. *Grinnell Corp. v. ITT Corp.*, 222 F.R.D. 74, 76 (S.D.N.Y. 2003).  "In New York, the elements of the attorney-client privilege are 'the existence of an attorney-client relationship, a communication made within the context of that relationship for the purpose of obtaining legal advice, and the intended and actual confidentiality of that communication.'" *Safeco Ins. Co. v. M.E.S., Inc.*, 289 F.R.D. 41, 45-46 (E.D.N.Y. 2011) (internal quotation omitted).  Under New York law, the party invoking the attorney-client privilege bears the burden of establishing all essential elements of the privilege. *Magee v. Paul Revere Life Ins. Co.*, 172 F.R.D. 627, 638 (E.D.N.Y. 1997).  An adequately detailed privilege log may satisfy this burden if, "as to each document, it sets forth specific facts that, if credited, would suffice to establish each element of the privilege." *Safeco*, 289 F.R.D. at 47 (internal quotation omitted).

"While state law governs the question of attorney-client privilege in a diversity action, federal law governs the applicability of the work product doctrine." *Tudor Ins. Co. v. Stay Secure Construction Corp.*, 290 F.R.D. 37, 39 (S.D.N.Y. 2013). Pursuant to Rule 26(b)(3) of the Federal Rules of Civil Procedure, material is protected from disclosure under the attorney work product doctrine where the material at issue is a document or tangible thing that was prepared in anticipation of litigation and prepared by or for a party to the action or by or for his representative. *Magee*, 172 F.R.D. at 639. Materials assembled in the ordinary course of business are not shielded by the work product privilege. *Id.* at 640.  The burden of establishing the elements of the work product privilege rests with the party invoking the privilege. *Id.*

In the instant case, the Court is not persuaded by the description set forth in the privilege log that the purpose of the communication regarding the hard drive recovered from surveillance equipment at subject premises was to obtain legal advice. *See Safeco*, 289 F.R.D. at 48 (descriptive entry does not establish that the email was prepared to elicit legal advice).  Similarly, the description does not establish that the email was sent in anticipation of litigation rather than in the ordinary course of the ongoing investigation of plaintiff's insurance claim. *See Tudor Ins. Co.*, 290 F.R.D. at 40 (as a general rule, insurance company's investigation to determine whether claim should be paid is not undertaken in anticipation of litigation).  Accordingly, defendant shall either disclose this document or submit it to the Court for in camera review within ten days of the filing of this Decision and Order.

As to the correspondence "regarding litigation budget," the Court is satisfied that this document falls within the confines of attorney work product prepared in anticipation of litigation. *See Gucci America, Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 80 (S.D.N.Y. 2010).

Finally, the Court denies plaintiff's request for an unredacted copy of the loss report (Dkt. #30-2), as the information redacted, *to wit*, defendant's reserve, is not relevant to the issues remaining in this litigation.  *Cf. National Union Fire Ins. Co. of Pittsburgh v. H&R Block, Inc.*, No. 12 Civ. 1505, 2014 WL 4377845, at * (S.D.N.Y. Sept. 4, 2014) (reserve information generally discoverable when there is a question as to whether insurer acted in bad faith).

-17-

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise."  *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party seeking to defeat a motion for summary judgment

-18-

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


Breach of the Insurance Contract

Plaintiff argues that Peerless is unable to substantiate its denial of plaintiff's claim under the insurance contract because it is "merely relying upon unspecified and unsubstantiated allegations based solely on surmised and unfounded allegations."  Dkt. #19-2, p.11.  Plaintiff relies upon the testimony of defendant's 30(b)(6) witness, Donald Tolhurst, who testified as to the absence of any evidence that plaintiff was responsible for the fire, committed any dishonest act or failed to cooperate. Dkt. #19-2, pp.12-13.


Defendant responds that Christian Waddington's declaration demonstrates that there are genuine questions of material fact as to the origin of the fire at the premises and defendant's financial motivation for setting the fire.  Dkt. #23-2, pp.9 & 12.  Moreover, defendant argues that circumstantial evidence may be sufficient to establish the defense of arson.  Dkt. #23-2, p.10. Finally, defendant argues that plaintiff misrepresented his financial circumstances.  Dkt. #23-2, pp.12-15.


It is well established in New York law that direct proof of arson is seldom available and, therefore, arson can be established in civil cases by circumstantial

evidence of which the financial position of the insured is often critically important. *Harary  v. Allstate Ins. Co.*, 988 F. Supp.93, 101 (E.D.N.Y. 1997), *aff'd* 162 F.3d 1147 (1998).  At trial, defendants bear the burden of presenting clear and convincing evidence that the fire was incendiary in origin and that plaintiffs had a motive and the opportunity to commit the crime.  *Id.* at 101-02.

On plaintiff's motion for summary judgment, however, plaintiff bears the initial burden of demonstrating that the fire was not intentionally set and that plaintiff had no motive to commit arson.  *Morley Maples, Inc. v. Dryden Mut. Ins. Co.*, 130 A.D.3d 1413, 1413-14 (3ʳᵈ Dep't 2015).  As there is no dispute that the fire was not accidental, plaintiff cannot meet his burden.

In any event, to defeat the summary judgment motion, defendant is merely required to demonstrate that plaintiff's premises may have been damaged by arson and the plaintiff may have had a motive to see the property destroyed by fire.  *Id.* at 1414.  Defendant has proffered sufficient evidence as to motive, *to wit*, plaintiff's interest in selling the premises; plaintiff's testimony regarding the financial status of the business at the premises; and plaintiff's financial circumstances.  Moreover, there is no dispute but that plaintiff was present when the fire was set.  It is for a jury, not the Court, to assess the credibility of plaintiff's testimony as to how the fire started.

As to the deposition testimony of defendant's 30(b)(6) witness, such "testimony is not a judicial admission that is binding on the corporation, and may be

contradicted by other witnesses, the same as any other witness's testimony."

*Document Security Sys., Inc. v. Coupons.com, Inc.*, 55 F. Supp.3d 485, 489 n.7

(W.D.N.Y. 2014).

In light of the foregoing, plaintiff's motion for summary judgment is denied.

Vacancy

Plaintiff argues that the vacancy provision is not applicable because he

was using the entire building for personal and business use at the time of the fire.  Dkt.

#19-2, p.14.

Defendant responds that plaintiff has failed to provide evidence as to how

the subject premises was used or whether it was rented.  Dkt. #23-2, p.17.

The insurance policy provides for a 15% reduction in payment for damage

to a building which has been vacant for more than 60 consecutive days prior to the loss.

Dkt. #23-4, p.71.  A building is deemed vacant when 70% or more of its total square

footage is neither rented nor used to conduct customary operations.  Dkt. #23-4, p.71.

Defendant has failed to meet its initial burden of demonstrating that the

70% of the building's square footage was not being used to conduct customary

operations.  Accordingly, this aspect of defendant's motion for summary judgment is

denied.

Business Income Loss

Defendant seeks dismissal of any business income loss claim based upon plaintiff's interrogatory response that "[p]laintiff is not making a loss of business income claim."  Dkt. #26 & Dkt. #27-3, ¶¶ 8, 9, 10 & 16.  Plaintiff admits that he has waived any right to seek payment for any alleged loss of business income.  Dkt. #26-1, ¶ 12 & Dkt. #31-9, ¶ 12.  Accordingly, this aspect of defendant's motion for summary judgment is granted.

Calculation of Actual Cash Value

Defendant argues that plaintiff should be precluded from presenting expert testimony as to the actual cash value of the building loss because plaintiff's expert, Donald Powers, estimated the replacement cost value rather than the actual cash value of the building loss.  Dkt. #28-2, p.12.

Plaintiff responds that he should be permitted to present expert testimony regarding his calculation of loss because the methodology for determining actual cash value is not set forth in the insurance policy.  Dkt. #31-8, pp.10-12. Plaintiff argues that because "it was a partial building loss and not a total, and the actual cash value of the building and the amount of insurance exceeds the cost to repair, the limiting factor is the cost to repair which is $76,863.30.  Dkt. #31-8, p.13.

Defendant replies that plaintiff does not dispute that there is no expert opinion as to the actual cash value of his loss and that the expert's opinion as to the

cost to repair the building is of no consequence given that plaintiff sold the property without making any repairs.  Dkt. #32, pp.10-11.

Defendant has failed to meet its burden of establishing that plaintiff's calculation of loss is improper. The declarations page indicates that coverage for the building is based upon replacement cost; the loss payment provision indicates that Peerless could opt to pay the value of damaged property or the cost of repairing or replacing the damaged property; and the policy affords the insured the option of claiming  actual cash value rather than replacement value, but does not mandate calculation of loss at actual cash value.  Accordingly, this aspect of defendant's motion for summary judgment is denied.

Replacement Cost Value

Peerless argues that plaintiff is not entitled to payment for loss at replacement cost because it is undisputed that he failed to repair or replace the property.  Dkt. #28-2, pp.10-11.

Plaintiff responds that he may replace the building with another property with functional similarity.  Dkt. #31-8, pp.6-8.  Plaintiff further argues that he should not be required to purchase a replacement property when he has not yet received any proceeds from the insurance policy.  Dkt. #31-8, pp.8-10.

Defendant replies that it is undisputed that plaintiff has neither repaired nor replaced the property, which is a condition precedent to recovering replacement

costs under the policy, and that this claim is not ripe until plaintiff has done so.  Dkt. #32, pp.6-8.

It is settled law in New York that replacement cost coverage inherently requires a replacement (a substitute structure for the insured) and costs (expenses incurred by the insured in obtaining the replacement).  *Alloush v. Nationwide Mut. Fire Ins. Co.*, No. 05-CV-1173, 2008 WL 544698, at *3 (N.D.N.Y. Feb. 26, 2008); *See Harrington v. Amica Mut. Ins. Co.*, 223 A.D.2d 222, 223 (4th Dep't 1996) ("replacement cost provisions of a homeowner's insurance policy require an insured to rebuild his home before he can recover on a claim for that cost."), *lv. denied*, 89 N.Y.2d 808 (1997).  In these cases, however, the insurance company had paid plaintiff the actual cash value of the damaged building.

In the instant case, in contrast, Peerless has withheld any payment on plaintiff's claim.  When presented with this situation in *Zaitchick v. American Motorists Insurance Company*, the district court determined that the insurance company's refusal to pay any monies under the insurance contract "made it impossible for plaintiffs to fulfill the condition precedent," thereby excusing plaintiff from performance of the replacement condition.  554 F. Supp. 209, 217 (S.D.N.Y. 1982), *aff'd* 742 F.2d 1441 (1983), *cert denied*, 464 U.S. 851 (1983); *See Woodworth v. Erie Ins. Co.*, 743 F. Supp.2d 201, 218 n.14 (W.D.N.Y. 2010) ("it is the law in New York that a complete failure to pay actual cash value, which prevents the insured from rebuilding or replacing,

may excuse the insured from performing the condition precedent of rebuilding or
replacing."), *reconsidered in part*, 2011 WL 98494 (W.D.N.Y. Jan. 12, 2011).

Defendant argues that *Zaitchick* is distinguishable because plaintiff's
declaration of financial means undermines his claimed inability to fulfill the insurance
policy's condition precedent of replacing the property.  Dkt. #32, pp.8-9.  However,
there is no precedent to suggest that plaintiff is under an obligation to expend personal
funds to satisfy a condition precedent to obtaining replacement cost coverage where
the insurance company is challenging coverage in the first instance.  Moreover,
plaintiff's sale of the property does not preclude replacement cost coverage; the insured
may replace the premises with a property with similar functionality at another location.
*See SR Int'l Bus. Ins. Co. Ltd v. World Trade Center Properties, LLC*, 445 F. Supp.2d
320, 334 (S.D.N.Y. 2006), *citing Kumar v. Travelers Ins. Co.*, 211 A.D.2d 128, 132 (4th
Dep't 1995) ("insured is not required . . .to replace the damaged dwelling on the same
premises in order to recover replacement cost.").

In light of the foregoing, defendant's motion for summary judgment with
respect to replacement cost coverage is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion to compel the deposition of
Mr. Powers (Dkt. #18), is granted; plaintiff's motion for partial summary judgment (Dkt.

#19), is denied; plaintiff's motion to compel (Dkt. #19), is granted in part; and

defendant's motion for summary judgment (Dkt. #26), is granted with respect to any

claim for business income loss and otherwise denied.

**SO ORDERED.**

**DATED:**     **Buffalo, New York**
         **February 2, 2017**

         _s/ H. Kenneth Schroeder, Jr._
         **H. KENNETH SCHROEDER, JR.**
         **United States Magistrate Judge**